## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| GRACE SCHULTE, individually and on behalf of all others similarly situated, | CIVIL FILE ACTION |
| Plaintiff, | NO. _____ |
| v. | |
| TIKTOK INC. (f/k/a MUSICAL.LY, INC.), and BYTEDANCE, INC. | **COMPLAINT – CLASS ACTION** |
| Defendants. | JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Grace Schulte, individually and on behalf of all others similarly situated, file this Class Action Complaint ("Complaint") against Defendants Tik Tok Inc. (f/k/a/ Musical.ly, Inc.) ("TikTok") and Bytedance, Inc. ("Bytedance," and together with TikTok "Defendants") for damages, injunctive relief, and other equitable relief. Based upon personal knowledge of the facts pertaining to Plaintiff and the investigation of counsel, Plaintiff alleges as follows:

## INTRODUCTION

1.     This is a class action is brought by Plaintiff on behalf of all natural persons in the United States who used the TikTok app to visit websites external to

the app, via the TikTok's in-app browser (the "Nationwide Class").

2.      Unbeknownst to Plaintiff and Class Members, TikTok and Bytedance invaded their privacy by secretly intercepting information about Plaintiff and Class Members without their consent.

3.      As described more fully below, Defendants insert a JavaScript code into websites visited by users through the TikTok in-app browser.  This code's purpose is to track every detail about a user's website activity.  This data, user inputs, actions, and even keystrokes, are recorded by Defendants and stored for their own profit.  At no time did Defendants disclose to Plaintiff and Class Members that, when using the in-app browser, Plaintiff's personal data was recorded by Defendants.

4.      Through the in-app browser, Defendants have secretly amassed massive amounts of users' personal information by tracking their activities on third-party websites.  Moreover, Defendants have unlawfully intercepted private and personally identifiable information, content and communications from TikTok users to generate massive revenues by selling the information for a profit, unbeknownst to users themselves.

5.      In February of 2019 and following an investigation, Defendants and the Federal Trade Commission (the "FTC") entered into a consent decree for Defendants' collection of information from minors under the age of 13 in violation

of the Children's Online Privacy Protection Act, 15 U.S.C. §§ 6501, *et seq*.  The FTC fined Defendants $5.7 million arising from this action.

6.      Defendants' acts did not stop there, in November 2019, a class action lawsuit was filed against Defendants for the alleged sharing of consumer biometric information.  Defendants settled the case in September 2021 for $92 million.

7.      Also, the Department of Justice initiated investigations in 2020 after a complaint was filed by various child privacy advocates alleging Defendants violated the terms of the previous FTC consent decree.

8.      Over the course of its existence, Defendants have been scrutinized by lawmakers around the globe for their privacy and security practices.  Defendants' application has been banned in all of the following countries at one point in time: Afghanistan, Armenia, Azerbaijan, Bangladesh, India, Iran, Pakistan, Syria, Indonesia, and Jordan.

9.      Moreover, Defendants made several representations regarding their privacy and security practices in front of U.S. lawmakers, both directly in an October 2021 senate hearing and through a June 2022 letter to senators.  A large portion of these representations, which Plaintiff argues are misrepresentations, support the claims alleged herein.

10.     Further, for over three years Defendants have been in talks with the Committee on Foreign Investment in the United States ("CFIUS"), an inter-agency group that reviews transactions involving foreign parties for national security threats.  Of note, the conduct alleged herein occurred during these conversations with CFIUS.

11.     In December 2022, Congress approved legislation banning Defendants' application on all federal devices entitled the No TikTok on Government Devices Act (the "Act").  As a result, Defendants' application is prohibited from being downloaded or accessed through any federal-issued device or network, with limited exceptions for law enforcement purposes. The Act complements several state decisions to ban Defendants' app from state government-issued devices including Arkansas, West Virginia, Louisiana, New Hampshire, Idaho, Georgia, North Dakota, Iowa, Alabama, Virginia, Utah, Oklahoma, Texas, South Dakota, Maryland, Nebraska, Florida, and Tennessee.  Likewise, the Act further supports previous bans as instituted by the United States Army, Air Force, Coast Guard, Marine Corps., Department of Defense, Department of Homeland Security and TSA.

12.     Through these pervasive surveillance activities, Defendants have violated various wiretap laws, unlawfully intruded upon user privacy and thus

4

violated the rights of such privacy and has done so all while unjustly reaping profits off of such unlawfully obtained user data.

13.     This action seeks to recover all available remedies, including statutory penalties, and to redress the wrongs imposed by Defendants on Plaintiff and Class Members.

## **PARTIES**

14.     Plaintiff Grace Schulte is a citizen and resident of the State of Georgia. Plaintiff downloaded the TikTok app and created her account in 2019.  At this time, Plaintiff was a minor of fifteen (15) years old.  While using TikTok, Plaintiff clicked advertising links to external, third-party websites.  In doing so, Defendants collected data associated with Plaintiff's use of third-party websites without her knowledge or consent.

15.     TikTok Inc., f/k/a Musical.ly, Inc., is a California corporation doing business throughout the United States, with its principal place of business in Culver City, California.  Defendant TikTok, Inc is a wholly owned subsidiary of Defendant ByteDance, Inc.

16.     ByteDance, Inc. is a Delaware corporation with its principal place of business in Mountain View California.  Upon information and belief, ByteDance, Inc. operates in concert with TikTok Inc. to carry out instructions relating to the

TikTok app. For example, based on the LinkedIn profiles of ByteDance, Inc. employees, these employees recruit applicants to work with them on the research and development of software for the TikTok app. Additionally, the "ByteDance" website displays job postings that specifically relate to the TikTok app.

## ALTER EGO AND SINGLE ENTERPRISE ALLEGATIONS

17.    At all relevant times, each Defendant functioned as an agent, servant, partner, joint venturer and/or alter ego of each of the other Defendants and acted in the course and scope of such agency, partnership, and relationship and/or in furtherance of such joint venture.

18.    At all relevant times, Defendants were controlled and owned by the same person, founder and Chinese national Yiming Zhang, and constitute a single enterprise with a unity of interest.

19.    At all relevant times, Defendants TikTok and ByteDance have shared the same office and employees. Further, many job postings offered by ByteDance are actually postings for employment at TikTok.

20.    At all relevant times, Defendants TikTok and ByteDance are directed by the ByteDance Beijing Headquarters with respect to the TikTok app, and Defendants have reported to the Beijing Headquarters in return.

21.    At all relevant times, Defendant TikTok, Inc. has been and remains a wholly-owned subsidiary of Defendant ByteDance, Inc.

22.    At all relevant times, the ByteDance Beijing Headquarters has collected and analyzed data from the United States regarding various security and privacy features on the TikTok app and has worked with Defendants to address any performance issues related thereto.    Additionally, at all relevant times, the ByteDance Beijing Headquarters and its engineers have done significant coding for the TikTok app and its many versions and updates.

23.    Plaintiff's investigation has revealed that, at certain relevant times, with respect to Defendants' monitoring and surveillance of content on the TikTok app, management in China has determined the policies enforced in Defendant TikTok's office.    Further, at certain relevant times, Defendant TikTok's executives have left the company en masse citing an inability to have any authority or oversight over their jobs, and pervasive upper-level favoring of the ByteDance Beijing office.

24.    This is consistent with many reports detailing worn out executives leaving in exodus.[1]    Plaintiff's investigations have revealed that "[a]t least five senior

---

[1] Emily Baker-White, *TikTok Is Bleeding U.S. Execs Because China Is Still Calling The Shots, Ex-Employees Say*, FORBES, Sept. 21, 2022, https://www.forbes.com/sites/emilybaker-white/2022/09/21/tiktok-bleeding-us-execs-china-control-bytedance/?sh=56d42e9c9707 (last accessed Jan. 17, 2023).

leaders hired to head departments at TikTok in the last years ... left the company after learning that they would not be able to significantly influence decision making."[2]  These ex-employees revealed that much of their guidance came from ByteDance Beijing.  The most common explanation was that individuals were hired under the guise of leading departments in the United States but were edged out in favor of ByteDance Beijing department heads—with one former leader stating, "A lot of our guidance came from HQ, and we weren't necessarily a part of strategy building...I've been in this industry for a long time.  I don't want to be told what to do."[3]

25.    Plaintiff's investigations have revealed that, at certain times relevant to Defendants' monitoring and surveillance of content on the TikTok app, certain TikTok employees received paychecks issued from ByteDance and/or had ByteDance listed as their employer on their tax returns.[4]

26.    Plaintiff's investigations further reveal that, at certain times relevant to the claims asserted herein, ByteDance controlled TikTok's workplace infrastructure; TikTok employees had email addresses tied to ByteDance's domain; and both

---

[2] *Id*.

[3] *Id*.

[4] *Id*.

companies primarily use a workplace tool suite created by ByteDance, to facilitate communication and administrative tasks.[5]

## JURISDICTION AND VENUE

27.    This Court has federal question jurisdiction over this case because this suit is brought under the Federal Wiretap Act, 18 U.S.C. §§ 2510, *et seq.*

28.    This Court also has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332 (d), because there are over 100 members of the proposed class, members of the proposed class are citizens of states in the United States and at least one (1) member of the class is diverse from Defendants, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

29.    This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

30.    This Court has personal jurisdiction over Defendants because Defendants routinely conduct business in Georgia, has sufficient minimum contacts in Georgia, and has intentionally availed itself of this jurisdiction by marketing and selling products and services in Georgia.

---

[5] Emily Baker-White, *Inside Project Texas, TikTok's Big Answer to US Lawmakers' China Fears*, BUZZFEED NEWS, Mar. 11, 2022, https://www.buzzfeednews.com/article/emilybakerwhite/tiktok-project-texas-bytedance-user-data (last accessed Jan. 18, 2023).

31.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants conduct a substantial amount of its business in this District, and some of the events that give rise to several of Plaintiff's claims occurred in this District.

## GENERAL FACTUAL ALLEGATIONS

### *TikTok, The Application*

32.    TikTok is a social media platform where users create, share, and view shorts videos. TikTok started in the United States as Musical.ly—an app where users can upload lip-synching videos.   In 2018, the Chinese technology company ByteDance purchased Musical.ly and incorporated it into their own video-sharing application called "Douyin."   This product was soon after launched for the non-Chinese international market, including the United States, and is the current version of the app used in the U.S. today. Douyin and TikTok have many instances of identical source code packages and share similarities in their user interfaces.[6]

33.    The app produces video shorts in many formats.   For example, many users enjoy and/or upload video content in the form of short dances, lip-synchs, comedy skits, and challenges. The TikTok interface builds off the ideas of previous applications like Vine or Instagram Stories where content is offered in endlessly

---

[6] Pellaeon Lin, *TikTok vs Douyin: A Security and Privacy Analysis*, THE CITIZEN LAB, Mar. 22, 2021, https://citizenlab.ca/2021/03/tiktok-vs-douyin-security-privacy-analysis/ (last accessed Jan. 1, 2023).

consumable, dopamine-boosting mini bites.  Videos on the platform are typically less than one minute long and play automatically upon opening the app. Users can easily find themselves aimlessly scrolling through these videos for hours without even realizing it.

34.    Moreover, the COVID-19 pandemic exacerbated this consumption, with many under lockdown orders and looking for more local forms of entertainment for their foreseeable future.  During this period, TikTok was the second most popular iPhone app and quickly maneuvered to become the most popular app in the United States by 2021.

35.    Shortly after its debut, the TikTok app surpassed Facebook, Instagram, YouTube, and Snapchat in monthly installations, with more than one billion downloads within its first month.  In 2019, the app was downloaded 693 million times and grew to 850 million downloads in 2020.  TikTok had approximately 1.2 billion monthly active users in Q4 2021 and was expected to reach 1.8 billion by the end of 2022.  In addition to impressive user growth, TikTok's revenue has rapidly increased from the time of its launch in 2017 from an annual revenue of $63 million

to a whopping $4.697 billion in 2021.  TikTok is expected to grow its ad revenue on par with YouTube's in 2024, which has been projected to be as high as $23.6 billion.[7]

36.     While TikTok is enjoyed by users of all ages, globally, its largest age demographic are users in the 20-30 age bracket, making up around 35% of their users.  Of notable concern, TikTok's second largest age demographic are users aged 10-19, or "minors" under most legal interpretations of the term, making up around 28% of the app's worldwide age demographic.

### TikTok, The Legal Problems

37.     During its course of existence, TikTok has frequently come under fire from government and regulatory enforcers regarding national security concerns.  As of January 2023, TikTok has been reportedly banned in the following countries:

---

[7] Zheping Huang, *TikTok Turns On the Money Machine*, BLOOMBERG: TECHNOLOGY, June 23, 2022, https://www.bloomberg.com/news/features/2022-06-23/tiktok-becomes-cash-machine-with-revenue-tripling-to-12-billion?leadSource=uverify%20wall (last accesses Jan. 17, 2023).

Afghanistan, Armenia, Azerbaijan, Bangladesh, India, and Pakistan.[8]  The app was also banned in Indonesia for some time but has since been lifted.[9]

38.    Moreover, TikTok has a longstanding and tenuous relationship with the United States government.  In February of 2019, following an investigation, the United States Federal Trade Commission (the "FTC") entered into a consent decree with TikTok, fining them $5.7 million for collecting information from minors under the age of 13 in violation of the Children's Online Privacy Protection Act (the "COPPA"), despite TikTok's claims that users under the age of 13 were not allowed on the app.[10]

39.    In the following October, United States Senators Charles Schumer and Tom Cotton sent a letter to the Acting Director of National Intelligence noting evidence that Defendants may share private and personally identifiable user data and content with the Chinese government:

> TikTok's terms of service and privacy policies describe how it collects data from its users and their devices,

---

[8] Danny Maiorca, *In What Countries is TikTok Banned*, MUO, Jan. 4, 2023, https://www.makeuseof.com/what-countries-is-tiktok-banned/ (last accessed Jan. 18, 2023).

[9] *Id*.

[10] Federal Trade Commission, *Video Social Networking App Musical.ly Agrees to Settle FTC Allegations That it Violated Children's Privacy* Law, Press Release, Feb. 27, 2019, https://www.ftc.gov/news-events/news/press-releases/2019/02/video-social-networking-app-musically-agrees-settle-ftc-allegations-it-violated-childrens-privacy (last accessed Jan. 18, 2023).

> including user content and communications, IP address,
> location-related data, device identifiers, cookies,
> metadata, and other sensitive personal information. While
> the company has stated that TikTok does not operate in
> China and stores U.S. user data in the U.S., ByteDance is
> still required to adhere to the laws of China.
>
> Security experts have voiced concerns that China's vague
> patchwork of intelligence, national security, and
> cybersecurity laws compel Chinese companies to support
> and cooperate with intelligence work controlled by the
> Chinese Communist Party....With over 110 million
> downloads in the U.S. alone, TikTok is a potential
> counterintelligence threat we cannot ignore.[11]

40.    Indeed, this risk was so great that in 2019 the Army banned the app on

all government-owned phones.  Additionally, U.S. government has begun to issue

bans of the TikTok application on government cell phones with other military

branches quickly following suit.[12]

41.    Just one month later in August, Trump signed an executive order

purporting to ban TikTok's transactions if the Company was not sold by

---

[11] Charles Schumer and Tom Cotton, *Letter to Acting Director of National Intelligence*, Oct. 23, 2019, https://www.democrats.senate.gov/imo/media/doc/10232019%20TikTok%20Letter%20-%20FINAL%20PDF.pdf (last accessed Jan. 18, 2023).

[12] Drew Harwell and Tony Romm, *U.S. Army bans TikTok on military devices, signaling growing concerns about app's Chinese roots*, THE WASHINGTON POST, Dec. 31, 2019, https://www.washingtonpost.com/technology/2019/12/31/us-army-bans-tiktok-military-devices-signaling-growing-concern-about-apps-chinese-roots/ (last accessed, Jan. 18, 2023).

ByteDance.[13]  Thereafter, there were talks of selling a portion of TikTok to several companies including Microsoft, Walmart, and Oracle, but nothing of substance had materialized.  A tentative deal between Oracle and ByteDance addressing plans to move U.S. user data to U.S. based servers, called "Project Texas" was put in place; however, was put on hold after Trump left office.[14]

42.    In June of 2021, President Joe Biden revoked the previous ban in an executive order and instructed the Secretary of Commerce to investigate whether the app posed a threat to national security.[15]  The instructions "directed the Commerce Department to investigate all entities that might provide Americans' sensitive data to foreign adversaries."[16]  In the time following, several United States lawmakers

---

[13] Donald J. Trump, *Executive Order on Addressing the Threat Posed by TikTok*, Executive Order, Aug. 6, 2020, https://trumpwhitehouse.archives.gov/presidential-actions/executive-order-addressing-threat-posed-tiktok/ (last accessed Jan. 18, 2023).

[14] Emily Baker-White, *Inside Project Texas, TikTok's Big Answer to US Lawmakers' China Fears*, BUZZFEED NEWS, Mar. 11, 2022, https://www.buzzfeednews.com/article/emilybakerwhite/tiktok-project-texas-bytedance-user-data (last accessed Jan. 18, 2023).

[15] Laura Feiner*, Biden revokes and replaces Trump executive orders that banned TikTok*, CNBC, Jun. 9, 2021, https://www.cnbc.com/2021/06/09/biden-revokes-and-replaces-trump-executive-orders-that-banned-tiktok.html (last accessed Jan. 18, 2023).

[16] Jimmy Quinn, *Biden Allegedly Slow-Walking TikTok Investigation, GOP Demands Answers*, NATIONAL REVIEW, Aug. 9, 2022, https://www.nationalreview.com/corner/biden-allegedly-slow-walking-tiktok-investigation-gop-demands-answers/ (last accessed Jan. 18, 2023).

wrote letters to the President criticizing his sloth-like movement on the TikTok investigation and demanding he take some form of action, again citing national security concerns pertaining to ByteDance's connections with the Chinese Communist Party (the "CCP").[17]

43.     Reports note these connections as well, stating many executives and department heads employed by Defendants previously came from jobs closely entangled with the CCP.  For example, CEO Shou Zi Chew left his CFO position at Chinese communication equipment manufacturer Xiaomi Corp.  The United States Department of Defense listed Xiaomi Corp. as a "Communist Chinese Military Company" in January 14, 2021 and removed the classification on June 3, 2021.[18]

44.     On August 16, 2021, a state investment fund set up by the Cyberspace Administration of China purchased a 1% stake in ByteDance.  These shares allowed the governmental body to name one board member out of ByteDance's three (3) member board.[19]

---

[17] *Id.*

[18] United States Department of Defense Press Release, Jan 14.  2021, https://www.defense.gov/News/Releases/Release/Article/2472464/dod-releases-list-of-additional-companies-in-accordance-with-section-1237-of-fy/ (last accessed Jan. 18, 2023).

[19] Yingzhi Yang and Brenda Goh; *Beijing takes stake, board seat in ByteDance's key China entity*, YAHOO!FINANCE, Aug. 16, 2021, https://finance.yahoo.com/news/bytedance-says-china-unit-holds-145610358.html (last accessed Jan. 16, 2021)

45.     It was later revealed that these shares, known as "golden shares," enable the Chinese government to make certain decisions and "provides the Communist party with a mechanism to remain deeply involved in their businesses, particularly the content the broadcast to millions of Chinese people."[20]

46.     Meanwhile, former overseer of online commentary at China's internet regulator and CCP official, Wu Shugang was elected by the governmental shareholder to sit on the ByteDance board.  In his position, Wu Shugang has a say over "business strategy and investment plants, any merger or acquisition, profit allocation and a vote on the group's top three executives as well as their remuneration packages" as shown by the company's charter.[21]

47.     Just a short two (2) months later, TikTok executives appeared in at an October 2021 Senate hearing to address concerns about social media's impact on children—with Senator Paul Blumenthal pointing out "[b]ig tech companies continue to prioritize profit over safety and, in doing so, are harming children

---

[20] Ryan McMorrow et al., *China moves to take 'golden shares' in Alibaba and Tencent units*, FINANCIAL TIMES, Jan. 12, 2023, https://www.ft.com/content/65e60815-c5a0-4c4a-bcec-4af0f76462de (last accessed Jan. 18, 2023).
[21] *Id.*

online."[22]   Directly addressing TikTok as "an especially egregious offender, both because they make the personal information of all TikTok users available to the communist Chinese government, and because the app pushes sexually explicit and drug-related content onto children."[23]

48.     Michael Beckerman, Vice President and Head of Public Policy for the Americas at TikTok, spoke on behalf of TikTok, stating that TikTok "do[es] not share information with the Chinese government."  At that time, TikTok was partly owned by CCP through the government's share in its parent corporation, ByteDance.

49.     In March of 2022, news reports revealed that "thousands of TikTok employees have scrambled to move the company's stores of information about its US users to data centers inside the US, and to restrict access to that data abroad" through a project "known internally as 'Project Texas.'"[24]

50.     In June of 2022, TikTok finally announced a great success related to Project Texas, stating  that "100% of US user traffic is being routed to Oracle Cloud

---

[22] *Blumenthal & Blackburn to Hold Hearing With Snapchat, TikTok & YouTube on Social Media's Impact on Children*, Richard Blumenthal: Newsroom: Press Releases, Oct. 19, 2021, [Blumenthal & Blackburn to Hold Hearing With Snapchat, TikTok & YouTube on Social Media's Impact on Children | U.S. Senator Richard Blumenthal (senate.gov)](#)
[23] *Id*.
[24] Baker-White, *supra*, note 19.

Infrastructure."[25]   Additionally, the Company announced a new department, "with US-based leadership, to solely manage US user data for TikTok."[26]

51.    That same month, in a letter addressed to nine republican senators, CEO Shou Zi Chew stated that "TikTok has not, at any point, misled Congress about our data and security controls and practices."[27]

52.    Notwithstanding these prior representations, in September 2022 testimony before the Senate Homeland Security Committee, TikTok confirmed, through former interim CEO now turned COO Vanessa Pappas, that it would not commit to cutting off China's access to U.S. user data.  Moreover, TikTok affirmed "that the company has said, on record, that its Chinese employees do have access to US user data," but "denied that TikTok [was] in any way influenced by China."[28]

---

[25] Albert Calamug, *Delivering on our US data Governance*, Jun. 17, 2022, https://newsroom.tiktok.com/en-us/delivering-on-our-us-data-governance (last accessed Jan. 18, 2023).

[26] *Id.*

[27] David McCabe, *TikTok tells Republican senators how it plans to keep American data away from China*, THE NEW YORK TIMES, July 1, 2022, https://www.nytimes.com/2022/07/01/technology/tiktok-tells-republican-senators-how-it-plans-to-keep-american-data-away-from-china.html (last accessed Jan. 18, 2023).

[28] Brian Fung, *TikTok won't commit to stopping US data flows to China*, CNN BUSINESS, Sept. 14, 2022, https://www.cnn.com/2022/09/14/tech/tiktok-china-data/index.html#:~:text=TikTok%20repeatedly%20declined%20to%20commit,satisfy%20all%20national%20security%20concerns.%E2%80%9D (last accessed Jan 18. 2023).

53.    In December of 2022, President Biden finally took action by "prohibiting the use of TikTok by the federal government's nearly 4 million employees on devices owned by its agencies," and provided "limited exceptions for law enforcement, national security and security research purposes."[29]

### *TikTok and the Corporation behind the Green Curtain*

54.    TikTok's parent company ByteDance was founded in 2012 and remains based in Beijing China and run by their CEO and co-founder, Chinese National, Liang Rubo.

55.    ByteDance develops video-sharing social networking services and applications, most notably "Douyin" and "Toutiao."

56.    ByteDance became a household name with the launch of their news and content platform Toutiao in late 2012. Toutiao joined the ranks of ByteDance's first-launched product "Neihan Duanzi," a platform allowing users to share memes, jokes, and funny videos, in garnering the attention of swarths of users.

57.    In 2018, Chinese regulators shut down both Toutiao and Duanzi applications citing vulgar content on the platform that triggered strong resentment

---

[29] David Ingram, *Biden signs TikTok ban for government devices, setting up a chaotic 2023 for the app*, NBC TECH NEWS, Dec. 30, 2022, https://www.nbcnews.com/tech/tech-news/tiktok-ban-biden-government-college-state-federal-security-privacy-rcna63724 (last accessed Jan. 18, 2023).

from internet users. In a letter, the CEO of Toutiao stated he was sorry for "publishing a product that collided with core socialist values." Toutiao was allowed to continue operations, albeit with a new, less vulgar, approach. Alternatively, Duanzi was permanently shut down, with users blaming their government's fearful sentiments against organizing, large groups, and rallies.[30]

58.    That same year, in August of 2018, ByteDance launched the TikTok application in the United States. In less than a year, the application skyrocketed in users, landing it among the topmost downloaded applications in the Apple and Android marketplaces.

59.    In May of 2020, Kevin Mayer, became both CEO of TikTok, Inc. and COO of ByteDance, Inc. after leaving his executive position with former employer Disney.[31] This was the Company's first CEO outside of its Beijing hierarchy. Mayer's leadership was short lived as he left only three (3) short months later in

---

[30] Shannon Liao, *Chinese fans of banned parody app find each other offline using secret codes*, THE VERGE, Apr. 12, 2018, https://www.theverge.com/2018/4/12/17230700/duanzi-fans-chinese-banned-parody-app-codes (last visited Jan. 17, 2023).
[31] Frank Pallotta and Kaya Yurieff, *Disney streaming chief leaves to become CEO of TikTok*, CNN BUSINESS, May 18, 2020, https://www.cnn.com/2020/05/18/media/kevin-mayer-disney-tik-tok/index.html (last accessed Jan. 17, 2023).

August 2020 citing concerns about the political environment and new-found realities about the limitations of his position.

60.     TikTok quickly appointed an interim CEO, Australian-Native Vanessa Pappas to take his place.  Vanessa Pappas served as interim CEO from then until Shou Zi Chew took over as CEO in May 2021, as discussed in more detail below. Vanessa Pappas remained with the company, and after leaving the interim position took on the role of ByteDance's new COO.

61.     In March 2021, ByteDance was reported to be part of a group of Chinese companies that aimed to use technology in order to circumvent Apple, Inc.'s privacy policies.[32]

62.     Shortly after, in May 2021, Zhang Yiming, ByteDance CEO and co-founder stepped down from his position and was replaced by fellow co-founder and ByteDance head of human resources, Liang Rubo.[33]  Interestingly, Zhang Yiming did not fully leave ByteDance and represents his new position allows him to have a

---

[32] *China's tech giants test way around Apple's new privacy rules*, FINANCIAL TIMES, Mar. 16, 2021, https://www.ft.com/content/520ccdae-202f-45f9-a516-5cbe08361c34 (last accessed Jan. 17, 2023).
[33] Echo Wang and Yingzhi Yang, *'I'm not very social': ByteDance founder to hand CEO reigns to college roommate*, REUTERS, May 19, 2021, https://www.reuters.com/world/china/exclusive-bytedance-co-founder-zhang-yiming-step-down-ceo-2021-05-20/ (last accessed Jan 17, 2023).

"greater impact on longer-term initiatives."[34]  Zhang Yiming is credited by most as the man pulling the strings behind ByteDance's whole operation.

63.    On August 16, 2021, a state investment fund set up by the Cyberspace Administration of China purchased a 1% stake in ByteDance.  These shares allowed the governmental body to name a board member out of a three (3) member board.[35]

64.    It was later revealed that the Chinese government bought certain shares in ByteDance known as "golden shares."  These special management shares enable the government to make certain decisions and "provides the Communist party with a mechanisms, to remain deeply involved in their businesses, particularly the content they broadcast to millions of Chinese people."[36]

65.    Moreover, former overseer of online commentary at China's internet regulator and CCP official, Wu Shugang was the Chinese government shareholder's choice for the board. In his position, Wu Shugang has say over "business strategy and investment plans, any merger or acquisition, profit allocation and [any] vote on

---

[34] *Id.*

[35] Yingzhi Yang and Brenda Goh; *Beijing takes stake, board seat in ByteDance's key China entity*, YAHOO!FINANCE, Aug. 16, 2021, https://finance.yahoo.com/news/bytedance-says-china-unit-holds-145610358.html (last accessed Jan. 16, 2021)

[36] Ryan McMorrow et al., *China moves to take 'golden shares' in Alibaba and Tencent units*, FINANCIAL TIMES, Jan. 12, 2023, https://www.ft.com/content/65e60815-c5a0-4c4a-bcec-4af0f76462de (last accessed Jan. 18, 2023).

the group's top three executives as well as their remuneration packages" as shown by the company's charter.[37]

66.    In May of 2021, CFO of ByteDance, Shou Zi Chew, was appointed CEO of TikTok.[38]  Shou Zi Chew came to work for Defendants after leaving his CFO position at Xiaomi Corp.[39]—The United States Department of Defense previously listed Xiaomi Corp. as a "Communist Chinese Military Company" on January 14, 2021, but removed the classification on June 3, 2021.[40]  Shou Zi Chew officially stepped down from his role as ByteDance's CFO six (6) months later in November of 2021.[41]   During this six (6) month period, Shou Zi Chew was concurrently employed by both ByteDance and TikTok.

---

[37] *Id.*

[38] Ryan Mac and Chang Che, *TikTok's C.E.O. Navigates the Limits of His Power*, THE NEW YORK TIMES, Sept. 16, 2022, https://www.nytimes.com/2022/09/16/technology/tiktok-ceo-shou-zi-chew.html (last accessed Jan. 18, 2023).

[39] Yue Wang, *Billionaire Zhang Yiming Steps Down As ByteDance Chairman*, FORBES: ASIA, Nov. 3, 2021, https://www.forbes.com/sites/ywang/2021/11/03/billionaire-zhang-yiming-steps-down-as-bytedance-chairman/?sh=58771b8e7016 (last accessed Jan. 18, 2023).

[40] United States Department of Defense Press Release, Jan 14.  2021, https://www.defense.gov/News/Releases/Release/Article/2472464/dod-releases-list-of-additional-companies-in-accordance-with-section-1237-of-fy/ (last accessed Jan. 18, 2023).

[41] Emily Baker-White, *Inside Project Texas, TikTok's Big Answer to US Lawmakers' China Fears*, BUZZFEED NEWS, Mar. 11, 2022, https://www.buzzfeednews.com/article/emilybakerwhite/tiktok-project-texas-bytedance-user-data (last accessed Jan. 18, 2023).

67.    By September 2022, TikTok's continual run-ins with regulatory and governmental bodies had proven too much for certain top department heads.  As explained above, "at least five senior leaders hired to head departments at TikTok in the last two years…left the company after learning that they would not be able to significantly influence decision-making."[42]  Among the exodus was former Global Chief Security Officer, Roland Cloutier in July of 2022, who "transitioned out of that role because the company…created a new department to manage U.S. user data."[43]  CEO Shou Zi Chew is quoted as stating that this restructuring "change[d] the scope of the Global Chief Security Officer (CSO) role."[44]

68.    In a November 2022 interview, Shou Zi Chew explains that he is "responsible for all the strategic decisions at TikTok" when asked about any potential for interference from the Chinese government.[45]

### *Defendants' Predatory Business Model*

69.    While on the surface TikTok appears as an innocuous social media application, in actuality, Defendants amass billions of dollars in revenue from the

---

[42] Baker-White, *supra*, note 2.

[43] *Id*.

[44] *Id*.

[45] Nilay Patel, *TikTok CEO Shou Zi Chew explains how US data will be kept out of China*, THE VERGE, Nov. 30, 2022, https://www.theverge.com/2022/11/30/23486771/tiktok-ceo-shou-zi-chew-data-protection-us-users (last accessed Jan 18. 2023).

application and relies on the sale of digital advertising space within the platform to reach such massive returns.  In the United States, TikTok's ad revenue is slated to grow by 184% just this year alone.[46]

70.    Defendant's tout that 1 in 2 TikTok users are likely to by something while using the application.  They further maintain that, 81% of users use TikTok to discover new products and brands.

71.    In 2020, TikTok for Business was launched, allowing businesses to purchase space on the platform and create a label specifying whom they want to target.  Users can click on the links in these ads to purchase the advertised product.[47]

72.    Tracking information such as a user's online commercial interests and habits are imperative and critical components of its advertising business model.  This kind of information allows TikTok to sell advertising space to its customers by being able to effectively target specific desired audiences.

73.    As a result, TikTok can charge "as much as 2.6 million for a one day run of a Top View ad—the first thing that pops up on users' feed when they open

---

[46] Zheping Huang, *TikTok Turns On the Money Machine*, BLOOMBERG, Jun. 23, 2022, https://www.bloomberg.com/news/features/2022-06-23/tiktok-becomes-cash-machine-with-revenue-tripling-to-12-billion?leadSource=uverify%20wall (last accessed Jan. 18, 2023).
[47] *Id*.

the app."  In comparison, Super Bowl ads run about $6.5 million each—however air only one day out of the whole year.  TikTok can charge their rates every day. [48]

74.    Further, TikTok teamed up with Shopify, Inc. to let merchants integrate their storefronts onto the platform.  Expanding TikTok's platform into the e-commerce world opens up a myriad of opportunity for increasing revenue.[49]

### The Truth Revealed

75.    On June 17, 2022, Buzzfeed News came out with an exclusive report stating that according to leaked internal TikTok meetings, engineers in China have had repeatedly accessed nonpublic data about U.S. TikTok users as recently as January 2022.  That same day, TikTok announced its plans to move U.S. user data to servers located in the United States.

76.    Two weeks later, FTC Commissioner Brendan Carr explained in an interview with the Reliable Sources show that the TikTok application is a wolf in "sheep's clothing," and "[i]f you look at the data that it collects, it's looking at search and browsing history…[b]iometrics including face print and voice print, key stroke patterns, [and] location information."[50]  Not only did Carr point out Defendants'

---

[48] *Id*.

[49] *Id*.

[50] Rachel Martin, *Can TikTok be trusted with users' data?*, NPR's The Morning Edition, Jun. 30, 2022, https://www.npr.org/2022/06/30/1108843837/can-tiktok-be-trusted-with-users-data (last accessed Jan 19. 2023).

predatory surveillance and data interception practices, but he continued to highlight that "rather than being forthright," Defendants have "repeatedly said, all U.S. user data is stored in the U.S., leaving [the public] with the impression there's no access [from China]."

77.    In response to these comments, TikTok VP and Head of Public Policy Michael Beckerman claimed the Commissioner was confused and explained that keystroke patterns are "not logging what you're typing" but instead are "anti-spam, anti-fraud measure[s] that check[] the rhythm of the way people are typing to ensure it's not a bot or some other malicious activity."  Beckerman maintained the stance that TikTok has never shared information with the Chinese government, and concluded his interview stating that ultimately, for Defendants, it was about "transparency."

78.    A late June letter from CEO Shou Zi Chew to nine Republican senators confirmed the previous reporting that "ByteDance employees in China had repeatedly accessed sensitive information about US TikTok users" in contravention of their previous representations to the public and the United States government.[51]

---

[51] Emily Baker-White, *LinkedIn profiles for hundreds of ByteDance employees reveal close connections between the company and China's propaganda industry*, Forbes, Aug. 11, 2022, https://www.forbes.com/sites/emilybaker-white/2022/08/10/bytedance-tiktok-china-state-media-propaganda/?sh=5d58f8f4322f (last accessed Jan. 19, 2023).

Moreover, in that very same letter, Chew continued to state that "TikTok has not, at any point, misled Congress about our data and security controls and practices."[52]

79.    On August 11, 2022, investigative journalist Emily Baker-White revealed that according to public LinkedIn profiles, over "three hundred current employees at TikTok and its parent company ByteDance previously worked for Chinese state media publications."[53]  Further, "fifteen [profiles] indicate that current ByteDance employees are also concurrently employed by Chinese state media entities, including Xinhua News Agency, China Radio International and China Central/China Global Television"—organizations among those designated by the United States Department of State as "foreign government functionaries" in 2020.[54]

80.    In August of 2022, privacy researcher and former Google engineer, Felix Krause, published a report on the risks of in-app Internet browsers.[55]  In this report, Krause reveals that while a user interacts with third-party websites in the

---

[52] David McCabe, *TikTok tells Republican senators how it plans to keep American data away from China*, THE NEW YORK TIMES, July 1, 2022, https://www.nytimes.com/2022/07/01/technology/tiktok-tells-republican-senators-how-it-plans-to-keep-american-data-away-from-china.html (last accessed Jan. 18, 2023).
[53] *Id.*
[54] *Id.*
[55] Felix Krause, *iOS Privacy: Instagram and Facebook Can Track Anything You Do on Any Website in Their In-App Browser*, KRAUSFX.COM (Aug. 10, 2022) https://krausefx.com/ (last accessed Jan. 19, 2023).

TikTok application's in-app browser, TikTok tracks and records all keyboard inputs in addition to every tap on any button, link, image, or other website element and even logging details about what that specific element is.[56]  Krause's full discovery is discussed in more detail below.

81.     On October 20, 2022, Forbes broke the story that Defendants planned to, and in fact, did, use the TikTok application to monitor the physical location of specific American citizens.[57]  The report explains that "[t]he project, assigned to a Beijing-led team, would have involved accessing location data from some U.S. users' devices without [the user's] knowledge or consent."[58]  This team reported to ByteDance CEO Rubo Lang and was led by ByteDance's Internal Audit and Risk Control department through Beijing-based executive Song Ye and TikTok's Chief Internal Auditor Chris Lepitak.  According to the report, "in at least two cases, the…team also planned to collect TikTok data about the location of a U.S. citizen who had never had an employment relationship with the company."[59]

---

[56] *Id.*
[57] Emily Baker-White, *TikTok Parent ByteDance Planned To Use TikTok To Monitor The Physical Location of Specific American Citizens*, Forbes, Oct. 20, 2022, https://www.forbes.com/sites/emilybaker-white/2022/10/20/tiktok-bytedance-surveillance-american-user-data/?sh=6b7bccf96c2d (last accessed Jan. 19, 2023).
[58] *Id.*
[59] *Id.*

82.    In response to the article, Defendants did not deny the surveillance, but instead tweeted that: "TikTok has never been used to 'target' any members of the U.S. government, activist, public figures or journalists," and that "TikTok could not monitor U.S. users in the ways the article suggested."[60]

83.    On November 30, 2022, TikTok CEO Shou Zi Chew gave a rare interview explaining Project Texas, an elaborate and expensive plan to move U.S. user data from their servers in Virginia and Singapore to a cloud infrastructure run by Oracle.[61]  He further represented that only US residents will have access to the system.  However, according to the aforementioned leaked audio, TikTok's Head of Data Defense has stated to a colleague: "It's almost incorrect to call it Oracle Cloud, because they're just giving us bare metal, and then we're building our VMs [virtual machines] on top of it."[62]

84.    On December 22, 2022, Forbes released an article revealing more information to the claims previously alleged their in the admittedly vague October article.  Journalist Emily Baker-White revealed that according to an internal email sent by TikTok General Counsel Erich Anderson, "ByteDance found that several of

---

[60] TWITTER, @TikTokComms, Oct. 20, 2022, https://twitter.com/TikTokComms/status/1583238906111459328 (last accessed Jan. 18, 2023).
[61] Patel, *supra*, note 53.
[62] Baker-White, supra, note 64.

its employees obtained the data of "a former BuzzFeed reporter and a Financial Times reporter," as well as a "small number of people connected to the reporters through their TikTok accounts."[63]  Additionally, the article notes that TikTok's head of Global Legal Compliance, Catherine Razzano, represented that she "did not know about the surveillance of journalists until late October," despite materials reviewed by Forbes "show[ing]  she was aware of the … investigation before that time."[64]

85.    On January 6, 2023, Baker-White sat down for an interview with the New York Times podcast "Hard Fork" to discuss TikTok's surveillance.[65]  Baker-White explained that she began her investigation into Defendants while she was still with BuzzFeed News in early 2022 and was specifically reporting on Project Texas. Baker-White explains that a "source leaked [her] audio from over 80 internal meetings at TikTok and ByteDance about Project Texas."  Upon publishing her findings, Defendants "started a leak investigation called Project Raven"—the project revealed later on in Baker-White's more in-depth December 22, 2022, reporting.[66]

86.    Baker-White explains:

---

[63] Emily Baker-White, *EXCLUSIVE: TikTok Spied On Forbes Journalists*, Forbes, Dec. 22, 2022, LINK, (last accessed Jan. 19, 2023).
[64] *Id*.
[65] Casey Newton and Kevin Roose, *Tik Tok's Spying Scandal and ChatGPT's Challenge to Google*, NY TIMES PODCASTS: HARD FORK, Jan. 6, 2023.
[66] *Id*.

> The goal of the investigation was to find out who was sourcing [her]. And part of the investigation entailed a ByteDance team—this is a team that doesn't work for TikTok; it works for TikTok's parent company, ByteDance—using the TikTok app to track [her] location via [her] IP address to try to see if [she] was meeting with any TikTok or ByteDance employees. Which means they were also tracking their employees' IP address-based location as well.

87.    Baker-White maintains she found out about Project Raven through sources inside the company and that was able to review internal materials about the project.  She further explained her reporting approach stating that the October 20, 2022, story breaking the news about Project Raven was purposefully vague and reported "in a much more general way" to protect internal sources for fear of retribution.[67]

### Defendant's Interception and Theft of User's Personal Information

88.    As previously explained, TikTok derives its primary income from the advertising revenues accumulated through targeted ads on the TikTok app.  This is a seemingly innocuous and common practice among the advertising agencies—since the beginning of the industry, advertisements have always attempted to cater to their audience's every habit and/or need.  TikTok presents its practices as the same, but

---

[67] *Id.*

as alleged in this complaint, have misrepresented their practices, and in doing so have gotten away with an enormous heist of stolen U.S. user data.

89.    When using the application, TikTok presents advertisements in a combination of forms: videos ads, banner ads, and links to store websites on prominent users' profile pages. Indeed, TikTok personalities, businesses, and organizations routinely place such links in public profiles to allow access to various storefronts, services, and/or product pages.

90.    When users interact with a TikTok advertisement, they are automatically directed to the external third-party website through the application's in-app browser. Users are not given any option to open the links through anything other than TikTok's in-app browser. Unbeknown to users, is that lurking behind this guise lies data scraping mechanisms meant to record users' every move.

91.    This information came to light from a report by privacy research and former Google engineer, Felix Krause, detailing the various security and privacy risks of in-app browsers. In his report, Krause explains that he used and created a tool called InAppBrowser.com to detect executed JavaScript commands. Krause concluded that "TikTok injects code into third-party websites through their in-app browsers that behave like a keylogger."[68]    Anything a user does within the

---

[68] Krause, *supra*, note 58.

34

application's in-app browser is recorded and stored by Defendants, including what links were clicked, what forms were filled out, any text inputs and their purposes, how the user scrolled, and what images were viewed.

92.   Essentially, Defendants have embedded malicious JavaScript code into the TikTok application that acts to intercept and surveil a user's communications with third-party websites through the application's in-app browser.

93.   For example, when a purchase is made through the TikTok browser, a user must input the information needed to complete the transaction—namely their sensitive personal information like their billing address, shipping address, and the associated credit or debit card information used.   This example was a simple commercial transaction.   The privacy implications get worse when confronted with the fact that many industries dealing with highly sensitive personal information, such as the medical and mental health industries, have various accounts on the application wherein users can find reputable doctors and get advice for their ailments.

94.   In another example, a modern therapy company, BetterHelp, has a verified account and uses the TikTok platform for advertising. Upon clicking the link in their Profile, or interacting with any of their ads, users are confronted with a questionnaire about their mental health needs.   A user's answers to those questions

would be thereafter accessible by any of Defendants' employees. Indeed, Defendants have already demonstrated such access as already explained above.

95.    This wiretap engages as soon as the in-app browser is launched; users are not provided with an opportunity to review any privacy policies or disclosures regarding this surveillance on third-party websites.

96.    After intercepting and capturing a user's private communications without consent, Defendants are able use the communications to recreate the user's entire interaction with the third-party website.  Defendants are able to essentially record and playback a user's browsing session for analysis and subsequently exploit their personal knowledge to their own financial gain.  Indeed, as a result of their interception and surveillance, Defendants are now better informed on their users and can feed them more curated advertising content and thus increasing their advertising revenue.

97.    Defendants' actions through the application's in-app browser are not a routine part of internet functionality.  Indeed, standard web browsers on mobile phones like Google Chrome or Apple's Safari do not record users in this manner.  It is upon information and belief that even the companies behind the third-party websites are unaware of the malicious code embedded in Defendants' application.

98.    The interception, surveillance and recording of a user's keystrokes, clicks, swipes, and text communications while using the third-party browser are contrary to the legitimate expectation of TikTok users in the United States and to established industry practices.  Moreover, Plaintiff and other Class Members had no knowledge of, nor gave consent to any sort of malicious code recording their communications on third-party websites accessed from TikTok's in-app browser. At no point did Defendants inform Plaintiff or Class Members of such practices.

99.    Further, Krause's report brings to light certain tactics that allow companies to hide the JavaScript commands they execute on third-party websites. Krause posits that "[e]specially after the publicity [he's received], tech companies that still use custom in-app browsers will very quickly update to use" these new tactics, "so their code becomes undetectable to us."[69]  Krause states that it has "become more important than ever to find a solution to end the use of custom in-app browsers for showing third party content."

100.   Even more harrowing, Krause's report states in response to the question: "Are companies doing this on purpose?" that "Building your own in-app browser takes a non-trivial time to program and maintain, [which is] significantly more than just using the privacy and user friendly alternative that's already been

---

[69] Krause, *supra*, note 58.

built into the iPhone for the past 7 years.  Most likely there is some motivation there for the company to track your activities on those websites."[70]

101.   As a result, upon information and belief and in light of the allegations herein, Defendants embedded certain malicious code into the TikTok application's third-party browser and intercepted Plaintiff's and Class Members' communications which were then stored by Defendants themselves or through a third-party contractor to be used later for Defendants' own financial benefit.

### *Data Collected through Defendants' In-App Browser Has Inherent Value to Plaintiff and Class Members*

102.   It is common knowledge that there is an economic market for consumers' personal data—especially of the type intercepted and surveilled by Defendants from Plaintiff and Class Members.

103.   For example, a Financial Times article details that "the surveillance of consumers has developed into a multibillion dollar industry conducted by largely unregulated companies"[71] obtaining information in various ways.  As a result, the companies essentially have "dossiers including thousands of details about individuals, including personal ailments, credit scores and even due dates for

---

[70] Id.

[71] Emily Steel, *Companies Scramble for Consumer Data*, FINANCIAL TIMES, Jun. 12, 2013, https://www.ft.com/content/f0b6edc0-d342-11e2-b3ff-00144feab7de (last accessed Jan. 19, 2023).

pregnant women."[72]   This information is in turn used to feed into algorithms "to determine how to predict and influence consumer behaviour."[73]

104.   Further, individuals can sell or monetize their own data if they choose. Indeed, Defendants themselves have valued individuals' personal data in monetary equivalents.

105.   As an example, even Meta has offered to pay individuals for their voice recordings and have paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Meta to collect data on how individuals use their smartphones.[74]

106.   Given the monetary value that data companies, like Defendants, have already paid for personal information in the past, Defendants have deprived Plaintiff and Class Members of the economic value of their data without providing proper consideration for their property in return.

---

[72] *Id.*

[73] *Id.*

[74] Josh Constine, *Facebook pays teens to install VPN that spies on them*, TECH CRUNCH, Jan. 29, 2019, https://techcrunch.com/2019/01/29/facebook-project-atlas/ (last accessed Jan. 19, 2023).

### *Plaintiffs' and Class Members' Reasonable Expectation of Privacy in Data Collected via Defendants' In-App Browser*

107.    Plaintiff and Class Members have a reasonable expectation of privacy in the data Defendants collected through the in-app browser.

108.    Several studies examining the collection and disclosure of personal data have concluded that such collection practices violate privacy expectations established as general social norms.

109.    Moreover, privacy polls and studies are nearly uniform in showing that almost all Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before data is collected and shared.

110.    Indeed, a Consumer Reports study analyzed consumer sentiment regarding this very topic and concluded that consumers are deeply aware of the value of their personal information, and more so aware of the lack of security regarding such information. According to the report, "greater consumer awareness of tracking ha[s] spawned significant distrust."[75]    The report further states that "96% of

---

[75] Benjamin Moskowitz et al, *Privacy Front & Center*, CONSUMER REPORTS, Fall 2020, https://thedigitalstandard.org/downloads/CR_PrivacyFrontAndCenter_102020_vf.pdf (last accessed Jan. 18, 2023).

Americans agree that more should be done to ensure that companies protect the privacy of consumers."[76]

111.   Additionally, studies show that most Americans—roughly six in ten U.S. adults—say that they do not think it is possible to go through daily life without having data collected by companies.[77]   This sentiment has not eroded people's expectation that their data remain private.  In fact, this sentiment has been a strong driving factor behind consumer's awareness of data privacy and the resulting pressures placed on the United States government to find solutions.

112.   When given a choice, users have shown that they will act consistently with these concerns and in favor of their expectation of privacy.  Following the new iPhone software rollout in 2021, requiring users to provide a clear, affirmative consent before allowing companies to track users, 85% of users worldwide and 94% of U.S. users chose **not** to share their data when prompted.

113.   Defendants surveilled, intercepted, collected and used Plaintiff's and Class Members' data in violation of their reasonable expectations of privacy.

---

[76] *Id.*

[77] Brooke Auxier et al., *Americans and Privacy: Concerned, Confused and Feeling Lack of Control over Their Personal Information*, PEW RESEARCH CENTER, Nov. 15, 2019, https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/ (last accessed Jan. 18, 2023).

*Plaintiff and Class Members Did Not Consent to Defendants' Data Collection*
*through its In-App Browser*

114.   As explained directly above, a core tenet of current data collection and privacy protection practices is built upon the idea that consumers are given notice and a reasonable opportunity to consent to a companies' collection and use of their data.

115.   In addition to consumer concerns regarding how companies handle their data, a majority of Americans (57%) say they are not too confident (40%) or not at all confident (17%) that companies follow what their privacy policies say they will do with users' personal data.[78]

116.   Against this backdrop, Plaintiff and Class Members did not knowingly consent to Defendants' collection of their data through the in-app browser.

117.   Moreover, nowhere in Defendants' Terms of Service or privacy policies is it disclosed that Defendants compel their users to use an in-app browser that inserts malicious JavaScript code into any third-party website visited, which in turn provides Defendants with a complete record of every keystroke, click, link, image, or other component on any website, alongside providing details about the elements clicked on by the user.

---

[78] *Id.*

118.   Without disclosure of this sort of data collection practices, and through the automatic incorporation of Defendants' in-app browser when navigating to any third-party website within the TikTok application, Defendants cannot have secured consent for the interception, sharing, and/or use of such user data.

**TOLLING**

119.   The statutes of limitations applicable to Plaintiff's claims were tolled by Defendants' conduct and Plaintiff's and Class Members' delayed discovery of their claims.

120.   As alleged above, Plaintiff did not know, and could not have known, when downloading and using the TikTok app that the in-app browser intercepted all of Plaintiff's activities and communications on third-party websites using purposefully inserted code that tracks every keystroke, tap, click, like, etc., and the details of any interaction with any third-party website accessed through the in-app browser.

121.   Plaintiff did not have the means to discover Defendants' allegedly unlawful conduct until the information was made public by Mr. Krause's research.

122.   Plaintiff could not have discovered, through the exercise of reasonable diligence, the full scope of Defendants' alleged unlawful conduct.   Defendants inserted code into the TikTok app's in-app browser that tracked all of Plaintiff's

activities while on third party websites.  Defendants also failed to disclose, that simultaneously this code insertion not only records user activity, but every single keystroke, interaction with the site, and content of those actions.

123.   All applicable statutes of limitations have been tolled under the delayed discovery rule. Under the circumstances, Defendants were under a duty to disclose the nature and significance of their data collection practices but did not do so. Defendants are therefore estopped from relying on any statute of limitations.

## CLASS ACTION ALLEGATIONS

124.   Plaintiff brings this action under Rule 23, individually and on behalf of the following class:

**Nationwide Class**: All natural persons in the United States who used the TikTok app to visit websites external to the app, via the TikTok's in-app browser (the "Nationwide Class");

125.   Excluded from the class are: (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) the Defendants, Defendants' subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendants' counsel.

126. **Numerosity**: The exact number of class members is unknown and unavailable to Plaintiff, but individual joinder is impracticable.  As of August 2020, TikTok represented that it had over 100 million U.S. users, more than 50 million of whom were daily users. The precise number of class members is unknown to Plaintiff at this time but may be determined through discovery.

127. **Predominant Common Questions**: The Classes' claims present common questions of law and fact, which predominate over any questions that may affect individual Class Members.  Common questions for the Classes include, but are not limited to, the following:

    a.  Whether Defendants violated the Federal Wiretap Act, 18 U.S.C. §§ 2510, *et seq*.;

    b.  Whether Defendants violated the Georgia Unfair and Deceptive Trade Practices Act, O.C.G.A. § 10-1-370, *et seq*.;

    c.  Whether Defendants violated the Georgia False Advertising Act, O.C.G.A. § 10-1-420, *et seq*.;

    d.  Whether Defendants unlawfully eavesdropped or surveilled in violation of O.C.G.A. §16-11-62.

    e.  Whether Defendants violated the common law right to privacy;

    f.  Whether Defendants engaged in fraud and deceit;

     g.  Whether Defendants were unjustly enriched;

     h.  Whether Plaintiff and the Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

     i.  Whether Plaintiff and the Class Members are entitled to actual statutory, punitive, or other forms of damages, and other monetary relief.

128.  **Typicality**: Plaintiff's claims are typical of the claims of other Class Members. The claims of Plaintiff and the Class Members arise from Defendant's conduct and are based on the same legal theories.

129.  **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interest antagonistic to the interests of the Class, and Defendants have no defense unique to any Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class, and they have the resources to do so. Neither Plaintiff nor their counsel have any interest adverse to the interests of the Class.

130. **Substantial Benefits**: This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and the joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

131. **Notice**: The nature of notice to the proposed Class is contemplated to be by direct mail upon certification of the Class or, if such notice is not practicable, by the best notice practicable under the circumstance including, inter alia, email, publication in major newspapers, and/or the internet.

132. Plaintiff reserves the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
*Violation of the Federal Wiretap Act*
**18 U.S.C. §§ 2510,** *et seq.*
**(On behalf of Plaintiff and Class Members**)

133.  The Federal Wiretap Act, 18 U.S.C. §§ 2510, *et seq*., prohibits the interception of any wire, oral, or electronic communications without the consent of at least one authority party to the communication.  The statute confers a civil cause of action on "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

134.  "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4)

135.  "Contents" is defined as "includ[ing] any information concerning the substance, purport, or meaning of that communication."  18 U.S.C. § 2510(8).

136.  "Person" is defined as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation."  18 U.S.C. § 2510(6).

137. "Electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in

whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

138.   Defendants are each a "person" for the purposes of the Wiretap Act because they are corporations.

139.   The code inserted by Defendants which copies every keystroke, action, or other component detailing a user's activity constitutes a "device or apparatus" because it is an electronic means of acquiring the contents of users' wire, electronic, or oral communications via the application's in-app browser.

140.   Plaintiff's and Class Members' sensitive personal information, data, and interactions with third-party websites through TikTok's in-app browser that Defendant's intercepted are "electronic communication[s]" under 18 U.S.C. § 2510(12).

141.   Plaintiff and Class Members reasonably believed that Defendants were not intercepting, recording, or disclosing their electronic communications.

142.   Plaintiff's and Class Members' electronic communications were intercepted during transmission, without their consent and for the unlawful and/or wrongful purpose of monetizing private information and data, including by using their private information and data to develop marketing and advertising strategies.

143.    Interception of Plaintiff's and Class Members' electronic communications without their consent occurred whenever a user clicked on a link to a website external to TikTok.  Defendants were not parties to those communications, occurring only between Plaintiff and Class Members and the third-party websites they sought to or did access.

144.    Defendant's actions were at all relevant times knowing, willful, and intentional, because Defendants are sophisticated parties who know the type of data they intercept through their own products.  Moreover, experts who uncovered the code injections in Defendants' in-app browser explained that its inclusion was intentional, non-trivial, engineering tasks of the kind that does not happen by mistake or randomly.

145.    Neither Plaintiff nor Class Members consented to Defendants' interception, disclosure, and/or use of their electronic communications. The websites that Plaintiff and Class Members visited did not know of or consent to Defendants' interception of the details about visitors' access to and activities on their websites. Nor could they—Defendants never sought to obtain, nor did it obtain, Plaintiff's, Class Members', or the third-party websites' consent to intercept their electronic communications through Defendants' in-app browser.

146.   Pursuant to 18 U.S.C. § 2520, Plaintiff and Class Members have been damaged by the interception, disclosure, and/or use of their communications in violation of the Wiretap Act and are entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and the Class and any profits made by Defendants as a result of the violation, of (b) statutory damages of whichever is the greater of $1000 per day per violation or $10,000; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

**SECOND CLAIM FOR RELIEF**
***Unlawful Eavesdropping and Surveillance***
**O.C.G.A. §§ 16-11-62, *et seq*.**
**(On behalf of Plaintiff and the Class)**

147.   Georgia law prohibits any person from intentionally and secretly intercepting, by the use of any device, instrument, or apparatus, the contents of a message sent by a telephone, telegraph, letter or by any other means of private communication."   O.C.G.A. § 16-11-62(4).   In addition, O.C.G.A. § 16-11-62(6) extends that statute's reach to "[a]ny person [who] commit[s] any other acts of a nature similar to those set out in paragraphs (1) through (5) of this Code section which invade the privacy of another."

148.   Defendants' in-app browser inserts malicious code into any website that is visited within the in-app browser. Defendants' application and in-app browser

51

are "Devices" as defined in O.C.G.A. § 16-11-60. This code records every keystroke made by the user, which could include, for example, names, physical addresses, email addresses, phone numbers, usernames, passwords, dates of birth, credit card numbers, bank account or other sensitive financial information, insurance information, social security numbers, search terms, doctor's names, spouse's names, children's names, or any other information typed into the in-app browser. Not only does the code record this information, but it also records every action taken by a user, such as when a user taps any button, link, image, or other component of the third-party website. As a result of this unauthorized surveillance, Defendants are provided with an incredibly detailed picture of the user and their various interests.

149.   Plaintiff and Class Members had a reasonable expectation of privacy in their data. Plaintiff and Class Members did not consent to, authorize, or know about Defendants' intrusion at the time it occurred. Plaintiff and Class Members never agreed that Defendants could collect or disclose their data from third-party websites.

150.   As a result, Defendants' surveillance and recording constitutes intentional intrusion upon Plaintiff and Class Members' privacy because such information was intended and expected to remain private from third parties, and Defendants collected such information without users' consent.

151.    Plaintiff and Class Members have been damaged as a direct and proximate result of Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

152.    Plaintiff and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendants as a result of their intrusion upon Plaintiff's and Class Members' privacy.

153.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendants' actions, directing at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

<u>**THIRD CLAIM FOR RELIEF**</u>
***Violation of Georgia Uniform Deceptive Trade Practices Act***
**O.C.G.A. §§ 10-1-370, *et seq*.**
**(On Behalf of Plaintiff and Class Members)**

154.    Under Georgia law, a person engages in deceptive trade practices when, in the course of business they: "(5) Represent[] that goods or services have sponsorship, approval, characteristic, uses, benefits or quantities that they do not have…(7) Represent[] that goods or services are of a particular standard, quality or

53

grade…if they are of another;…(9) Advertise[] goods or services with intent not to sell them as advertised." O.C.G.A. § 10-1-370.

155.    Defendants misrepresented material facts regarding the TikTok application and its privacy and security features.    Defendants represented that Plaintiff and Class Members' private data would not and had not been accessed by any unauthorized individuals, when in reality, Plaintiff and Class Members' private data could be accessed and indeed *was* accessed without authorization.

156.    Plaintiff and Class Members relied on these representations and did so to their detriment and injury in continuing their use of Defendants' application and services.    Had Defendants been truthful and accurate with their representations, Plaintiff and Class Members would not have continued using the TikTok application, and thus feeding Defendants' personal information to be used for Defendants' own monetary gain.

157.    Defendants' actions have caused Plaintiff and Class Members substantial injury, and as a result, Plaintiff and Class Members are entitled to equitable relief, including, but not limited to, injunctive relief, restitution, and the appropriate penalties and damages to be imposed upon Defendants for their actions as alleged herein.    Plaintiff and Class Members also seek such other relief as the Court may deem just and proper.

158.   Plaintiff and Class Members have suffered irreparable injury from these unauthorized acts of disclosure: their personal, private, and sensitive data has been collected, viewed, accessed, and used by Defendants, and have not been destroyed. Due to the continuing threat of such injury, Plaintiff and Class Members have no adequate remedy at law and are entitled to injunctive relief.

**FOURTH CLAIM FOR RELIEF**
***Violation of Georgia False Advertising Act***
**O.C.G.A. §§ 10-1-420, *et seq*.**
**(On Behalf of Plaintiff and Class Members)**

159.   Georgia's False Advertising Act provides "[n]o person, firm, or corporation shall offer for sale…services by making, publishing, disseminating, circulating, or placing before the public within this state…with intent, design, or purpose not to sell the…services so advertised."

160.   Defendants misrepresented material facts regarding the TikTok application and its privacy and security features.   Defendants represented that Plaintiff and Class Members' private data would not and had not been accessed by any unauthorized individuals, when in reality, Plaintiff and Class Members' private data could be accessed and indeed ***was*** accessed without authorization.

161.   Defendants offered their product and services, i.e. the TikTok application and its entertainment services, with the intent that consumers use the services, and with the intent that in doing so, customers would unknowingly provide

Defendants with certain private information for Defendants' own commercial exploitation and profit.

162. Defendants' actions have caused Plaintiff and Class Members substantial injury, and as a result, Plaintiff and Class Members are entitled to equitable relief, including, but not limited to, injunctive relief, restitution, and the appropriate penalties and damages to be imposed upon Defendants for their actions as alleged herein. Plaintiff and Class Members also seek such other relief as the Court may deem just and proper.

163. Plaintiff and Class Members have suffered irreparable injury from these unauthorized acts of disclosure: their personal, private, and sensitive data has been collected, viewed, accessed, and used by Defendants, and have not been destroyed. Due to the continuing threat of such injury, Plaintiff and Class Members have no adequate remedy at law and are entitled to injunctive relief.

## FIFTH CLAIM FOR RELIEF
### *Common Law Invasion of Privacy*
### Intrusion upon Seclusion
### (On behalf of Plaintiff and Class Members)

164. Plaintiff asserts claims for intrusion upon seclusion and so must plead that (1) Defendants intentionally intruded into a place, conversation, or matter as to which Plaintiff and Class Members had a reasonable expectation of privacy; and (2) such intrusion was highly offensive to a reasonable person.

56

165. Defendants' in-app browser inserts malicious code into any website that is visited within the in-app browser. This code records every keystroke made by the user, which could include, for example, names, physical addresses, email addresses, phone numbers, usernames, passwords, dates of birth, credit card numbers, bank account or other sensitive financial information, insurance information, social security numbers, search terms, doctor's names, spouse's names, children's names, or any other information typed into the in-app browser. Not only does the code record this information, but it also records every action taken by a user, such as when a user taps any button, link, image, or other component of the third-party website. As a result of this unauthorized surveillance, Defendants are provided with an incredibly detailed picture of the user and their various interests.

166. Defendants' surveillance and recording of all sorts of data, as explained above, constitutes an intentional intrusion upon Plaintiff's and Class Members' solitude or seclusion because such information was intended and expected to remain private from third parties, and Defendants collected such information without users' consent.

167. Plaintiff and Class Members had a reasonable expectation of privacy in their data. Plaintiff and Class Members did not consent to, authorize, or know about

Defendants' intrusion at the time it occurred. Plaintiff and Class Members never agreed that Defendants could collect or disclose their data from third-party websites.

168. Plaintiff and Class Members did not consent to, authorize, or know about Defendants' intrusion at the time it occurred. Plaintiff and Class Members never agreed that their data would be collected or used by Defendants.

169. Defendants' intentional intrusion on Plaintiff's and Class Members' solitude or seclusion without consent would be highly offensive to a reasonable person. Plaintiff and Class Members reasonably expected that their data would not be collected or used.

170. The blatant taking and disclosure of data from millions of individual TikTok users is highly offensive because it violates expectations of privacy that have been established by modern social norms. An overwhelming majority of Americans believe one of the most important privacy rights is the need for an individual's affirmative consent before personal data is collected or shared.

171. Given the nature of the data Defendants collected and disclosed including, but not limited to: names, physical addresses, email addresses, IP addresses, phone numbers, usernames, passwords, dates of birth, credit card numbers, bank account or other sensitive financial information, insurance information, social security numbers, search terms, doctor's names, spouses names,

children's names, or any other information which is typed into the in-app browser, in addition to every tap, keystroke, and user action, and the details about the contents of each interaction—this kind of intrusion would be, and indeed is, highly offensive to a reasonable person.

172.   As a result of Defendants' actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

173.  Plaintiff and Class Members have been damaged as a direct and proximate result of Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

174.   Plaintiff and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendants as a result of their intrusion upon Plaintiff's and Class Members' privacy.

175.   Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendants' actions, directing at injuring Plaintiff and Class Members in conscious disregard of their

rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

**SIXTH CLAIM FOR RELIEF**
***Fraud and Deceit***
**O.C.G.A. §§ 51-6-2, *et seq*.**
**(On Behalf of Plaintiff and Class Members)**

176.   Under Georgia Law, a person commits fraud when that person makes a misrepresentation that is intended to deceive and that does deceive, *Thompson v. Wilkins*, 143 Ga. App. 739 (1977).  Georgia law provides an action for deceit when "[w]illful misrepresentation of a material fact, made to induce another to act, upon which such person acts to his injury."  O.C.G.A. § 51-6-2.

177.   To prove fraud, the following elements are required: (1) a false representation, (2) with intent to deceive, (3) an intention to induce the plaintiff to act or refrain from acting in reliance on the false representation, (4) justifiable reliance by the plaintiff on the false representation, and (5) damage to the plaintiff. O.C.G.A. §§ 23-2-51, 23-2-57.

178.   Defendants have deceived Plaintiff and Class Members under each element of fraud.  Defendants made false representations regarding the security and privacy of their personal data on their application.  Such representations were made with the intent to induce plaintiff and Class Members to continue using Defendants' application.  Finally, Plaintiff and Class Members justifiably relied on the truth of

60

Defendants representations to their own detriment—in continuing their use of Defendants' application, Plaintiff's and Class Members' data was surreptitiously intercepted and used to bolster Defendants' profits without receiving any notice or consent to do so from Plaintiff and Class Members.

179.   First, Defendants suggested certain untrue fact as true when Defendant believed such facts to be untrue.  Defendants repeatedly represented they did not make use of or share user data.  Defendants were caught in their lie red handed by investigative journalists in October 2022 but continued to assert such representations as true.  Only in December have Defendants admitted to both using and transmitting user data.

180.   Moreover, in doing so, Defendants also asserted facts as true with no reasonable grounds for believing it to be true.  Indeed, Defendants had literally just settled their related cases with certain parties regarding strikingly the same conduct as described herein.  Defendants had no reasonable grounds to assert that user data was not being shared or transmitted at this point in time given their settlement and the concurrent factual allegations contained herein.

181.   Defendants made these deceptive representations with the intent to induce Plaintiff's and Class Members' continued use of the TikTok application.  If Defendants had represented the accurate truth, a trove of users would have flocked

from the application under data privacy concerns. This poses grave problems for Defendants' business model, which derives billions in revenue from advertising to a massive user-base.

182. As a result, Defendants misrepresentations were intended to induce Plaintiff's and Class Members' continued use of Defendants' application. Such continued use was to Plaintiff's and Class Members' immediate detriment as Defendants represented that their personal data was secure when in fact it was under constant risk from access and breach by Defendants and their Employees. Moreover, given Defendants' links to the Chinese government, Plaintiff and Class Members were at all times at risk of their data being breached by individuals in China and even the Chinese government. Indeed, as represented above, this sort of breach did occur and caused widespread harm to both Plaintiff and Class Members. Finally, such misrepresentation and deceit were substantial factors in causing Plaintiff's and Class Members' continued use of Defendants' application.

183. In light of the allegations contained herein, and Defendants' intentional and particularly egregious conduct, Plaintiff and Class Members are entitled to equitable relief, including, but not limited to, injunctive relief, restitution, and the appropriate penalties to be imposed upon Defendants for their actions as alleged

herein. Plaintiff and Class Members also seek such other relief as the Court may deem just and proper.

184.   Plaintiff and Class Members have suffered irreparable injury from these unauthorized acts of disclosure: their personal, private, and sensitive data has been collected, viewed, accessed, and used by Defendants, and have not been destroyed. Due to the continuing threat of such injury, Plaintiff and Class Members have no adequate remedy at law and are entitled to injunctive relief.

### SEVENTH CLAIM FOR RELIEF
*Unjust Enrichment*
**(On behalf of Plaintiff and Class Members)**

185.   Defendants received benefits from Plaintiff and Class Members in the form of data which has substantial monetary value that Defendants, in turn, sold for marketing and advertising purposes while unjustly retaining such benefits at the expense of Plaintiff and Class Members.

186.   Plaintiff and Class Members unknowingly conferred a benefit upon Defendants in the form of valuable sensitive information that Defendants collected from Plaintiff and Class Members, without authorization and proper compensation. Defendants collected and used this information for their own gain, providing Defendants with economic, intangible, and other benefits, including substantial

monetary compensation from third parties who utilize Defendants' marketing and advertising services.

187.    Defendants unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendants' conduct damages Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

188.    The benefits that Defendants derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members.  It would be inequitable under unjust enrichment principles for Defendants to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

189.    Defendants should be compelled to disgorge, in a common fund for the benefit of Plaintiff and Class Members, all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper.

## **PRAYER FOR RELIEF**

190.    WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgement as follows:

    a.   An order certifying the proposed Classes, designating Plaintiff as the named representative of the Classes, designating the undersigned as

Class Counsel, and making such further orders to protect Class members as the Court deems appropriate;

b.  An order enjoining Defendants to desist from further deceptive business practices with respect to the in-app browser and such other injunctive relief that the Court deems just and proper;

c.  A declaration that Defendants are financially responsible for all Class notice and the administration of Class relief;

d.  An award for Plaintiff and Class Members costs, restitution, compensatory damages for economic loss and out of pocket costs, damages under applicable state laws, punitive and exemplary damages under applicable law; and disgorgement, in an amount to be determined at trial;

e.  All remedies available under the Federal Wiretap Act, including but not limited to, damages whichever is the greater of (A) actual damages suffered by Plaintiff and Class Members and any profits made as a result of the violations; or (B) statutory damages of whichever is greater of $100 a day for each day of violation or $10,000;

f.  Any applicable statutory and civil penalties;

g. An award of costs and attorneys' fees, as allowed by law;

h. An order requiring Defendants to pay both pre- and post-judgement interest on any amounts awarded;

i. Leave to amend this Complaint to conform to the evidence produced at trial; and

j. Such other or further relief as the Court may deem appropriate, just, and equitable under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Respectfully Submitted, this 24th day of January 2023.

HERMAN JONES LLP

By: */s/ John C. Herman*
John C. Herman
    (Ga. Bar No. 348370)
Candace N. Smith
    (Ga. Bar No. 654910)
Connely M. Doizé
    (Ga. Bar No. 663453)
3424 Peachtree Road, N.E., Suite 1650
Atlanta, Georgia 30326
Telephone: (404) 504-6500
Facsimile: (404) 504-6501
jherman@hermanjones.com
csmith@hermanjones.com
cdoize@hermanjones.com

66

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day electronically filed this document with the Clerk of the District Court, and the CM/ECF system will send notification of such filing to all attorneys of record.

Dated: January 24, 2023

*/s/ John C. Herman*___
John C. Herman
*Counsel for Plaintiffs*